**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**PORSHA MCCAIN,**

   **Plaintiff,**

             **Civil Action 2:20-cv-1481**
             **Judge Edmund A. Sargus, Jr.**
  **v.**           **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

   **Defendant.**

### REPORT AND RECOMMENDATION

  Plaintiff, Porsha McCain ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 13), the Commissioner's Memorandum in Opposition (ECF No. 16), and the administrative record (ECF No. 12). For the following reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

### I. BACKGROUND

  Plaintiff applied for disability insurance benefits on December 8, 2016, alleging a closed period of disability beginning August 25, 2016 and ending March 26, 2018. (R. at 42, 198-199.) Plaintiff's claim was denied initially and upon reconsideration. (R. at 126-133, 142-144.) Upon request, a hearing was held on February 7, 2019, in which Plaintiff appeared and testified. (R. at 38-83.) A vocational expert ("VE"), Pauline Pegram, also appeared and testified at the hearing.

(*Id.*)  On March 29, 2019, Administrative Law Judge Jacqueline Y. Hall-Keith ("the ALJ") issued a decision finding that Plaintiff was not disabled during the alleged closed period.  (R. at 17-36.)  On January 18, 2020, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1-6.)  Plaintiff then timely commenced the instant action.  (ECF No. 1.)

## II.  RELEVANT HEARING TESTIMONY

### A.    Plaintiff's Testimony

Plaintiff testified at the February 2019 administrative hearing.  (R. at 44-70.)  Plaintiff testified that she was 24 years old, single, and had a four-year-old child.  (R. at 44.)  Plaintiff testified that she was involved in a motor vehicle accident in August 2016, and suffered multiple fractures which required multiple surgeries as a result.  (R. at 55-56.)  Specifically, Plaintiff testified that she suffered fractures to her left elbow, pelvis, left femur, right ankle, right wrist, and tailbone.  (R. at 56.)  Plaintiff testified that, with regard to her impairments from August 2016 until March 2018, she "had to relearn how to walk completely," "had to relearn how to use [her] left hand," "couldn't run or jump," and "[didn't] have very good strength in [her] hands or [her] legs."  (R. at 57.)  Plaintiff testified that at first, she could only walk between half a block and one block from August 2016 to March 2018, that she could only stand for about five minutes, and could not sit more than about two hours.  (R. at 63-64.)  Plaintiff testified that during her physical therapy, she could only lift about fifteen pounds.  (R. at 64.)

Plaintiff testified that she went through physical therapy, and that during the beginning of her recovery her pain was a 10/10.  (R. at 57-58.)  Plaintiff testified that after surgery and with medication, her pain was reduced to an 8/10 level for about a month or a month-and-a-half, but over time her pain level fell to about 5/10.  (R. at 58.)  Plaintiff also testified that she experienced

2

mental impairments between August 2016 and March 2018. (R. at 60.) Specifically, Plaintiff testified that she experienced anxiety, especially in stores while shopping or while driving, as well as poor memory, sadness, crying, poor concentration, low energy, low self esteem, feelings of shame, and low interest in things. (R. at 60-61.) Plaintiff testified that she saw a psychiatrist once every two months, and that she still sees the psychiatrist. (R. at 61-62.) Plaintiff testified that she was prescribed Zoloft by Dr. Allison Dailey in May 2017, but that Dr. Dailey has since switched Plaintiff to Celexa and Valium. (R. at 62-63.)

Plaintiff also testified that she was in a nursing home for a little over two months after the motor vehicle accident, and while she was there she could not use her hands to operate hand controls, use a microwave, push a button on a remote control, push keys on a keyboard, flip a light switch, or close a door handle. (R. at 65.) Plaintiff testified that she could do such things after she left the nursing home. (*Id.*) Plaintiff testified that she could only reach overhead or reach forward with her left arm, and it wasn't until after she left the nursing home that she could do so with her right arm. (R. at 65-66.) Plaintiff also testified that she couldn't pick up a pen or paperclip using a pinching function, she could not pick anything up with her left hand, and she was not able to operate foot controls or drive during this time. (R. at 66-67.)

Plaintiff testified that from August 2016 to March 2018, she could not get dressed by herself, could not get in or out of the shower by herself, couldn't stand in the shower, and she had her mother make dinner for her. (R. at 67-68.) Plaintiff also testified that she did the dishes "maybe once," but that she did not do laundry, change the linen on the bed, vacuum, dust, mop, sweep, take out trash, drink alcohol, use illegal drugs, or smoke cigarettes. (R. at 68-69.) Plaintiff also testified that she used crutches for approximately three to six months, and that she did not use a cane. (R. at 69-70.)

Plaintiff testified that she still is unable to climb stairs, and that she has balance issues. (R. at 67.)  Plaintiff testified that she receives food stamps and healthcare help from the State, and that she is employed by DeNA Healthcare.  (R. at 45-46.)  Plaintiff testified that, in that role, she makes $13.25 per hour, and she works 40 hours per week in the business office.  (R. at 46-47.)  Plaintiff testified that she lifts "a pound [or] maybe two" of supplies at work, and that she sits at least six hours a day at work.  (R. at 47.)  Plaintiff testified that she uses a wheelchair when she goes to the store.  (R. at 68.)

Plaintiff testified that prior to working at DeNA Healthcare, she worked at Easter Seals for about a month.  (R. at 48.)  Plaintiff testified that in that job, she worked 35 to 40 hours week, staying overnight with residents while they slept, and she made $11 per hour.  (*Id.*)  Plaintiff testified that, for that job, she sat for the eight hours.  (R. at 49.)  Plaintiff also testified that, as a State Tested Nursing Aide ("STNA") in Circleville, her job including standing, walking, bending, lifting up to ten pounds, and sitting about three hours per day.  (R. at 51.)  Plaintiff testified that she also had worked as an STNA at Fairfield Medical, and that her job there included standing, walking, bend, and lifting and carry patients with another person.  (R. at 52-53.)  Plaintiff testified that she had worked as an STNA at multiple other facilities.  (R. at 53-55.)

B.     **Vocational Expert's Testimony**

Ms. Pauline Pegram testified as the VE at the administrative hearing.  (R. at 70-82.) Based on Plaintiff's age, education, and work experience and the residual functional capacity ultimately determined by the ALJ, the VE testified that a similarly situated hypothetical individual could perform the following jobs that exist in significant numbers in the national economy:  inspector and sorter.  (R. at 78.)

## III. RELEVANT RECORD EVIDENCE

### A.     Grant Hospital

On August 25, 2016, Plaintiff was admitted to the emergency room at Grant Hospital following a head-on motor vehicle collision.  (R. at 334.)  Plaintiff's presented with open right ankle and left elbow fractures, but her biggest complaint was of right ankle pain.  (*Id.*)  Initial CT scans showed right rib fractures 4-6, left rib fractures 6 and 7, grade 2 splenic laceration and grade 1 left kidney laceration, no significant hemoperitoneum and no pelvic/retroperitoneal hematoma, pelvic fractures including left superior rami extending into acetabulum, bilateral superior and interior pubic rami, right SI joint diastasis and lex proximal femur fracture, open right distal tibia, medial malleolus, and distal fibula.  (*Id.*)  Plaintiff was admitted to the ICU.  (*Id.*)  Plaintiff then underwent multiple surgeries for her fractures, and she remained in the hospital for approximately one week.  (*See generally* R. at 326-742.)  In Plaintiff's Discharge Summary, Shaunta Nate' Stanford, CNP wrote that Plaintiff "is in good condition," "is ambulating/doing well with therapies," and that she was "[m]edically ready for discharge."  (R. at 475.)  She was discharged on September 3, 2016.  (*Id.*)

### B.     Heartland of Chillicothe

From September 3, 2016 until October 31, 2016, Plaintiff was admitted to the Heartland of Chillicothe for treatment, physical therapy, and rehabilitation.  (R. at 880-995.)  Plaintiff was prescribed pain and anxiety medication and began physical therapy on September 13, 2016.  (R. at 892.)  Over the course of her treatment, Plaintiff generally reported good overall progress and consistent improvement, with noted increases in her endurance, stamina, strength, and balance.  (*See generally* R. at 880-995.)  Upon discharge, Plaintiff was given crutches, a raised toilet seat

with arms, a tub bench, a standard wheelchair, a handheld shower head, and grab bars.  (R. at 880.)

## C.    Dr. Benjamin Taylor

On August 25, 2016 (the day of Plaintiff's motor vehicle accident), Plaintiff was referred to Benjamin Craig Taylor, MD, for an orthopedic surgery trauma consultation at Grant Hospital. (R. at 1151.)  Dr. Taylor noted that Plaintiff's injuries "are not completely evaluated at this time due to [Plaintiff] needing to go to CT scan," but that "[w]e will obtain more xrays for complete evaluation."  (R. at 1151-1153.)  Dr. Taylor was the primary surgeon for Plaintiff's multiple procedures that day:  (1) irrigation and debridement with excision of skin, subcutaneous tissue, fascia, muscle and bone, right ankle; (2) open reduction and internal fixation of right bimalleolar ankle fracture; (3) open reduction and internal fixation of right ankle syndesmosis; (4) treatment of left femoral shaft fracture with intramedullary implant; (5) irrigation and debridement with excision of skin, subcutaneous tissue, fascia, muscle and bone, left open olecranon fracture; (6) open treatment of left olecranon fracture with internal fixation; (7) repair lateral collateral ligament, left elbow, with local tissue; and (8) repair medial collateral ligament, left elbow, with local tissue.  (R. at 1145-1150.)

On September 13, 2016, Dr. Taylor saw Plaintiff for a follow-up appointment.  (R. at 1141-1142.)  Plaintiff reported that she was getting better, and that her pain was stable and was alleviated by rest and pain medication, but it was worsened by activity and movement.  (*Id.*)  Dr. Taylor noted that Plaintiff "does have significant bone loss involving the left femur," and he discussed with Plaintiff the possibility of undergoing a bone grafting procedure.  (*Id.*)  On October 10, 2016, Dr. Taylor saw Plaintiff again and noted that her "surgical incision(s) are benign and healing."  (R. at 1138-1140.)  On November 8, 2016, Dr. Taylor saw Plaintiff for

another follow-up appointment where Plaintiff reported that her pain was decreasing. (R. at 1136-1137.) Dr. Taylor reviewed x-rays of Plaintiff's right ankle, left elbow, left femur, right wrist, and pelvis, which generally "show[ed] signs of fracture healing" and "well-maintained reduction and alignment" of Plaintiff's fractures. (*Id.*) Overall, Dr. Taylor wrote that Plaintiff was "recovering nicely from [her] severe injuries." (*Id.*)

On January 3, 2017, Plaintiff returned to Dr. Taylor and reported that she was "slowly getting stronger." (R. at 1134-1135.) Dr. Taylor noted that Plaintiff "is ambulating unassisted, and [her] balance appears to be without issue," and he reported that Plaintiff "has been exercising to try to get stronger and recover." (*Id.*) Dr. Taylor commended Plaintiff "on her hard work in recovery thus far" and added that "[s]he is doing very well considering her severe injuries and should continue to recover more." (*Id.*) Dr. Taylor added that "I advised that she is not likely to be 100% but is on a great trajectory now." (*Id.*) On March 15, 2017, Dr. Taylor again noted that Plaintiff was ambulating unassisted without balance issues, and he repeated that Plaintiff "is doing very well considering her severe multiple injuries." (R. at 1132-1133.) On May 31, 2017, Plaintiff reported to Dr. Taylor that she was "doing great" with 1/10 pain, and Dr. Taylor wrote that she was still ambulating unassisted without balance issues, with full bilateral ankle range of motion and strength. (R. at 1130-1131.)

On March 20, 2018, Plaintiff returned to Dr. Taylor complaining of knee soreness. (R. at 1128-1129.) Dr. Taylor ordered and reviewed an x-ray of Plaintiff's femur, which showed "maintenance of alignment but evidence of distal interlocking screw breakage." (*Id.*) Dr. Taylor noted that Plaintiff was still ambulating unassisted without balance issues, but noted that she had "evidence of implant failure distally" and may require implant removal or bone grafting. (*Id.*) On April 24, 2018, Dr. Taylor reviewed a CT scan of Plaintiff's femur and found femoral

nonunion. (R. at 1126-1127.) On October 3, 2018, Plaintiff saw Dr. Taylor for the last time, and

Dr. Taylor noted that diagnostic studies showed "some mild maturation of the healing femur

bone." (R. at 1124-1125.) Dr. Taylor again noted that Plaintiff was ambulating unassisted

without balance issues. (*Id.*) Dr. Taylor reported that Plaintiff wished to delay any procedure on

her femur until after she completed her nursing program, and Dr. Taylor advised her to return if

she experienced any future thigh pain. (*Id.*)

**D.     State Agency Consultants**

State Agency consultant Anne Prosperi, D.O., reviewed Plaintiff's file at the initial level

on April 7, 2017, and provided assessments of Plaintiff's physical residual functional capacity

("RFC"). (R. at 98-111.) Specifically, Dr. Prosperi found that Plaintiff could occasionally lift

and/or carry up to 50 pounds; frequently lift and/or carry 20 pounds; stand and/or walk (with

normal breaks) for about six hours in an eight-hour workday; sit (with normal breaks) for about

six hours in an eight-hour workday; was otherwise unlimited in her ability to push and/or pull

(including operation of hand and/or foot controls); was occasionally limited in climbing

ramps/stairs, climbing ladders/ropes/scaffolds, and crawling; was not limited in her balancing;

and was frequently limited in her stooping (i.e., bending at the waist), kneeling, and crouching

(i.e., bending at the knees). (R. at 107-108.) Dr. Prosperi found that postoperative x-rays

showed "no hardware complications, well-maintained alignments of [fractures] and signs of

[fracture] healing," that Plaintiff was "slowly getting stronger" with decreasing pain and

unassisted ambulation with no balance issues. (R. at 108.) Dr. Prosperi also noted that Plaintiff

had full range of motion and strength in her ankle, and that she was expected to be capable of

this RFC twelve months from the date of onset. (*Id.*) Dr. Prosperi found that Plaintiff had no

manipulative, visual, or communicative limitations, but she should "avoid even moderate

exposure" to hazards such as machinery or heights. (R. at 108-109.) Dr. Prosperi ultimately

concluded that Plaintiff was not disabled, with the following explanation:

> You said you were disabled due to broken elbow, broken ankle, broken leg, broken wrist, broken pelvis, broken tailbone, depression and anxiety. Although you feel like anxiety affects your functioning, medical evidence supports that your mental conditions would have no more than a minimal impact on your functioning and is considered non severe. Your physical conditions cause you pain and discomfort, however it is not totally disabling. We do not have sufficient vocational information to determine whether you can perform any of your past relevant work. However, based on the evidence in file, we have determined that you can adjust to other work.

(R. at 111.)

On August 12, 2017, State Agency consultant Angela Bucci, D.O., reviewed Plaintiff's

file at the reconsideration level and agreed with Dr. Prosperi's above assessments. (R. at 113-

124.) Dr. Bucci also concluded that Plaintiff was not disabled, and provided following

explanation:

> We have reviewed your request for reconsideration. You said you were disabled due to broken elbow, broken ankle, broken leg, broken wrist, broken pelvis, broken tailbone, depression and anxiety. Although you feel like anxiety affects your functioning, medical evidence supports that your mental conditions would have no more than a minimal impact on your functioning and is considered non severe. Your physical conditions cause you pain and discomfort, however it is not totally disabling. Your condition resulted in some limitations in your ability to perform work related activities. We have determined that your condition was not disabled on any date through 06/30/2017, when you were last insured for disability benefits. We do not have sufficient vocational information to determine whether you can perform any of your past relevant work. However, based on the evidence in file, we have determined that you can adjust to other work. After a careful review of the additional evidence, as well as evidence already available in file, the initial decision is affirmed.

(R. at 124.)

# IV. ADMINISTRATIVE DECISION

On March 29, 2019, the ALJ issued her decision. (R. at 17-36.) At step one of the sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in any disqualifying substantial gainful activity during the alleged closed period of August 25, 2016 through March 26, 2018. (R. at 22.) At step two, the ALJ found that Plaintiff had the following severe impairments: multiple fractures left elbow; pelvis; left femur; tailbone; right wrist; right ankle; status-post surgical repairs; depression; and anxiety during the alleged closed period of August 25, 2016 through March 26, 2018. (R. at 22-23.) The ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23.) At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that, during the requested closed period of August 25, 2016 through March 26, 2018, the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) with the following limitations:

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

- Occasional postural activities, but no jogging, jumping, running, or climbing ladders, ropes, or scaffolds;

- Occasional forward and overhead reaching, and occasional gross manipulation and fine manipulation with her left upper extremity;

- Must avoid all exposure to hazards, such as dangerous machinery and unprotected heights; and

- Work is limited to simple, routine and repetitive tasks with occasional contact with the public, co-workers, and supervisors.

(R. at 25-26.) The ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. at 26.)

The ALJ addressed each of Plaintiff's impairments during the alleged closed period. First, the ALJ discussed all of the injuries Plaintiff suffered in her August 25, 2016 motor vehicle accident, as revealed in diagnostic images from that day: right rib fractures at 4-6; left rib fractures at 6 and 7; grade 2 splenic laceration and grade 1 left kidney laceration; pelvic fractures including left superior rami extending into acetabulum; bilateral superior and inferior pubic rami; right sacroiliac joint diastasis; left proximal femur fracture; open right distal tibia; medial malleolus; and distal fibula. (R. at 27.) The ALJ then detailed the "extensive repairs of her fractures," and noted that "[f]rom the hospital, [Plaintiff] went to a nursing home where she stay[ed] for approximately two months and participated in physical therapy." (*Id.*) The ALJ noted that Plaintiff "was discharged with medical equipment that included crutches, a tub bench, and grab bars." (*Id.*)

In discussing Plaintiff's recovery, the ALJ noted that by October 2016, "x-rays showed well-maintained reductions and alignments of all fractures," and that by November 2016 Plaintiff "was noted to be using crutches and her balance[] appeared poor, but she reported decreasing

pain." (*Id.*)  The ALJ highlighted that "[f]our months status-post the surgical repairs of her multiple fractures, in January 2017, [Plaintiff] was continuing to report decreasing pain, and was noted as ambulating unassisted and [with] no issue with balance." (*Id.*)  The ALJ also noted that "[b]y May 2017, [Plaintiff] reported that she was doing great and was noted to still be ambulating unassisted with no balance issues." (*Id.*)  Then, the ALJ reviewed Progress Notes from March 2018 (just before the end of Plaintiff's alleged closed period), and noted that Plaintiff had a "pleasant mood with appropriate affect," was "ambulating unassisted" without balance issues, exhibited full range of motion and extension strength in her right knee joint, and "was advised to continue mobilization without restrictions." (R. at 28.)

The ALJ also considered the medical opinions in the record. (R. at 28-29.)  First, the ALJ considered the reviewing physician and psychological opinions from the State Agency Division of Disability Determinations, at both the initial and reconsideration levels, affording them "[l]imited weight . . . in light of medical evidence and [Plaintiff's hearing testimony . . . which indicates that a greater degree of limitations during the closed period is warranted." (R. at 28.)  Next, the ALJ afforded "[a] limited amount of weight" to the April 11, 2017 opinion from psychologist Josh S. Reece, Psy.D., noting that "while [the ALJ] agrees that [Plaintiff's] mental health symptoms had a mild effect on her ability to handle workplace stress, additional evidence, along with [Plaintiff's] hearing testimony[,] indicates additional limitations regarding understanding, remembering and carrying out instructions; concentrating, persisting and maintaining pace; interacting with others; and adapting herself." (R. at 29.)

After discussing the objective and subjective evidence in the record, the ALJ concluded as follows:

> Based on the entire record, including the testimony of the claimant, the undersigned concludes that the evidence fails to support the claimant's assertions of total

disability for the requested closed period of August 25, 2016 through March 26, 2018. Although the claimant suffered multiple fractures requiring surgical repair, her recovery time only last[ed] a few months. The claimant briefly used a wheelchair and then crutches for the first few months of her recovery, but four months status-post her surgeries; the claimant was ambulating unassisted without exhibiting any balance issues. Further, in January 2017, the claimant was noted with a full range of motion in her elbow with no restriction. Additionally, treatment records establish that the claimant repeatedly reported that her pain was well controlled with her pain medications. Finally, no medical professional found that the claimant was disabled. Despite the evidence demonstrating that the claimant has suffered from medically determinable "severe" impairments, the evidence also establishes that the claimant retained the capacity to function adequately to perform many basic activities associated with work. The claimant could assist her parents with cooking, cleaning, and shopping, was independent in her personal care and finances, and was able to take care of her two-year old son. The residual functional capacity outlined above accounts for the claimant's testimony which is consistent with and supported by medical evidence of record, regarding vocational limitations that her condition would have placed on her.

(R. at 29 (citations omitted).)

Relying on testimony from the VE, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, she was capable of making a successful adjustment to other work that existed in significant numbers in the national economy during the requested closed period of August 25, 2016 through March 26, 2018. (R. at 30-31.) The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act during the requested closed period of August 25, 2016 through March 26, 2018. (R. at 31-32.)

## V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the [Social Security Administration] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI. ANALYSIS

Plaintiff puts forth two assignments of error: that the ALJ's RFC determination is not supported by substantial evidence, and that the ALJ failed to properly evaluate Plaintiff's impairments under medical listing 1.06 and, as a result, the ALJ's decision is not supported by the facts, the law, or substantial evidence. (ECF No. 13 at PAGEID ## 1244-1253.) Specifically, Plaintiff argues that the ALJ "is asserting that the ability to ambulate is equal to the ability to perform substantial gainful activity, without recognizing the continuing pain and

problems that [Plaintiff] continued and continues to endure since her accident," and that "the ALJ crafted [an RFC] based on her own interpretation of the medical evidence and cherry-picked statements from the record." (R. at 1244-1249.) To this end, Plaintiff highlights that she used crutches during the alleged closed period, and argues that the Social Security regulations and SSR 96-9 recognize the ability to perform sedentary work may be impacted by the use of assistive device, but the ALJ "fails to indicate if [Plaintiff's use of crutches] was considered in her [RFC] determination." (*Id.* at PAGEID ## 1248-1249.) Plaintiff also argues that she has put forth sufficient evidence to demonstrate that her impairments meet or equal Listing 1.06, and that the ALJ either inadequately or completely failed to evaluate the medical evidence by "merely recit[ing] the requirements of the Listing, without concise analysis or a discussion of the facts of the case." (*Id.* at PAGEID ## 1249-1253.)

In response, the Commissioner argues that "Plaintiff's arguments fail because she looks to her functioning almost exclusively within the first three months immediately following her accident." (ECF No. 16 at PAGEID # 1258.) As to Plaintiff's first argument, the Commissioner argues that the ALJ considered objective and subjective evidence that showed that "within twelve months of the accident, Plaintiff's pain was well controlled, her elbow's mobility was improving, and Plaintiff was engaging in a variety of daily activities such as cooking, cleaning, shopping, and caring for her child who was just two years old." (*Id.* at PAGEID # 1267.) The Commissioner further notes that the ALJ expressly cited "Plaintiff's own statements related to effective treatment," "Plaintiff's reports that her pain was alleviated by medication and that she was doing great by May 2017," and Plaintiff's testimony that "she did not require prescription pain medication for more than one or two months after the accident," before concluding that "the ALJ properly concluded that Plaintiff's subjective allegations of disabling pain, weakness, and

inability to walk was not entirely consistent with the record as a whole." (*Id.* at PAGEID #

1268.) The Commissioner also argues that "Plaintiff's arguments about the effects of her pain

are misplaced," and that "the record contains no evidence that Plaintiff used [crutches or another

assistive device] for at least twelve months." (*Id.* at PAGEID # 1269.)

As to Plaintiff's second argument, the Commissioner argues that "[t]he ALJ's listing

analysis was proper and supported by substantial evidence." (*Id.* at PAGEID # 1263.)

Specifically, the Commissioner argues that after describing the requirements of the listing, the

ALJ "correctly observed that, less than twelve months after her alleged onset of disability,

Plaintiff was ambulating unassisted and displayed normal balance." (*Id.*) The Commissioner

rejects Plaintiff's "vague statement referencing difficulty ambulating due to pain and weakness,"

arguing that "a wide chasm exists between an individual with *some* difficulty walking and one

who ambulates ineffectively pursuant to the listings." (*Id.* at PAGEID # 1264.) The

Commissioner also emphasizes that Plaintiff has "[t]he burden to prove she was unable to

ambulate effectively for at least twelve months," but "[t]he evidence of record did not support a

finding that listing 1.06 was met or equaled and the ALJ provided an appropriate analysis

consistent with the evidence and explaining her conclusion." (*Id.* at PAGEID # 1265.)

Plaintiff did not file a Reply brief. Accordingly, the matter is ripe for judicial review.

The Court will analyze each of Plaintiff's arguments separately.

## A.      Substantial Evidence Supports the ALJ's RFC Finding.

The determination of a claimant's RFC is an issue reserved to the Commissioner. 20

C.F.R. §§ 404.1527(d), 416.927(d). Nevertheless, substantial evidence must support the

Commissioner's RFC finding. *Berry v. Astrue*, No. 1:08-cv-411, 2010 WL 3730983, at *8 (S.D.

Ohio June 18, 2010). An ALJ must explain how the evidence supports the limitations that he or she sets forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96-8p, 1996 WL 374184, at *7 (internal footnote omitted). Additionally, to award benefits, the ALJ must find that the Plaintiff had a medically determinable physical or mental impairment with a duration longer than twelve months – even where, as here, Plaintiff only alleges a closed period of disability. 42 U.S.C. § 423(d)(1)(A); *Nash v. Comm'r of Soc. Sec.*, No. 19-6321, 2020 WL 6882255, at *6 (6th Cir. Aug. 10, 2020) ("[T]here was no need for the ALJ to address the question of whether temporary closed-period benefits should be awarded when she found that Nash had no disability with a duration longer than twelve months.").

Here, the Court finds that the ALJ's decision was supported by substantial evidence, including the ALJ's finding that Plaintiff had the residual functional capacity to perform sedentary work during the alleged closed period. After considering the entire record, including not only Plaintiff's medical records and opinion evidence from the State Agency consultants and consultative psychologist Dr. Reece, but also Plaintiff's own testimony, the ALJ cited substantial evidence in concluding that Plaintiff is capable of sedentary work with various exertional, postural, and environmental limitations. (R. at 25-29.) For instance: (1) Plaintiff's October 2016 x-rays which showed well-maintained reductions and alignments of all fractures; (2) Dr. Taylor's progress note that as of January 3, 2017, Plaintiff was "ambulating unassisted, and [her]

17

balance appear[ed] to be without issue"; (3) Dr. Taylor's progress note that as of May 31, 2017, Plaintiff said that she was "doing great" and was still ambulating unassisted with no balance issues; (4) Plaintiff's March 20, 2018 appointment with Dr. Taylor, at which time Plaintiff's diagnostic and physical examinations were unremarkable and Plaintiff "was advised to continue mobilization without restrictions." (R. at 27-28.) This is more than substantial evidence supporting the ALJ's conclusions.

The ALJ also carefully considered the State Agency medical consultant's opinion that Plaintiff should be limited to "frequent lifting and carry 20 pounds, and occasional lifting and carrying 50 pounds; sitting for about six hours and standing/walking for about six hours in an eight-hour workday; with unlimited balancing, frequent stooping, kneeling, and crouching; and occasionally crawling, and climbing stairs, ramps, ladders, ropers or scaffolds," with "moderate exposure to hazards," but the ALJ only afforded this opinion "[l]imited weight" in light of the aforementioned medical evidence and Plaintiff's hearing testimony, "which indicate[d] that a greater degree of limitations during the closed period [was] warranted." (R. at 28.) Considering all of the above substantial evidence (and more), the ALJ concluded as follows:

> Based on the entire record, including the testimony of the claimant, the undersigned concludes that **the evidence fails to support the claimant's assertions of total disability for the requested closed period** of August 25, 2016 through March 26, 2018. **Although the claimant suffered multiple fractures requiring surgical repair, her recovery time only last[ed] a few months.**

(R. at 29 (emphasis added).)

Plaintiff overlooks this, however, and focuses on the fact that she "was still using crutches to ambulate in November 2016" to argue that the ALJ's RFC "is not based on the comprehensive evidence of record." (ECF No. 13 at PAGEID ## 1245-1246.) This argument is particularly unavailing, however, in light of the substantial medical evidence which showed that

Plaintiff was ambulating unassisted with no balance issues from as early as January 3, 2017 through her most recent appointment with Dr. Taylor in October 2018 – not to mention Plaintiff's testimony that she only "used crutches for probably a good six months, three months, six months, somewhere around there." (R. at 69-70.)

Plaintiff also highlights diagnostic imaging from March 2018, April 2018, and October 2018 to argue that "she was still recovering" from her disability, in an effort to dispute the ALJ's conclusion that Plaintiff's "recovery time only last[ed] a few months." (ECF No. 13 at PAGEID ## 1246-1247.) This argument fails, however, because it is not this Court's job to determine whether the ALJ could have agreed with Plaintiff, but rather to evaluate whether the ALJ's finding was supported by substantial evidence. *Rogers*, 486 F.3d at 241 ("This court's review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards."). For the reasons discussed above, the Court finds that the ALJ's finding was supported by substantial evidence and was made pursuant to the proper legal standards. The Court, therefore, must defer to the ALJ's RFC. *Nash v. Comm'r of Soc. Sec.*, No. 19-6321, 2020 WL 6882255, at *4 (6th Cir. Aug. 10, 2020) ("Even if the record could support an opposite conclusion, we defer to the ALJ's finding because it is supported by substantial evidence, based on the record as a whole.") (internal citations omitted).

While Plaintiff may have preferred a different RFC than the one determined by the ALJ, the ALJ thoroughly explained the bases for the RFC determination, including how the ALJ concluded that Plaintiff did not meet the twelve month durational requirement. The ALJ's explanation enjoys substantial support in the record. *Dickinson v. Comm'r of Soc. Sec.*, No. 2:19-CV-3670, 2020 WL 4333296, at *11 (S.D. Ohio July 28, 2020), *report and recommendation adopted*, No. 2:19-CV-3670, 2020 WL 5016823 (S.D. Ohio Aug. 25, 2020)

(citing *Schmiedebusch v. Comm'r of Soc. Sec.*, 536 F. App'x 637, 649 (6th Cir. 2013); *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) ("The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.")).  Under these circumstances, the Court finds no merit to Plaintiff's first statement of error.

**B.      The ALJ Properly Evaluated Listing 1.06.**

Plaintiff also argues that the ALJ "failed to rely on the substantial evidence of the record supporting a finding that [Plaintiff's] impairments meet or equal [Listing 1.06]," and that Plaintiff "has met her burden of putting forth sufficient evidence to demonstrate that her impairment meets and/or equals" the Listing.  (ECF No. 13 at PAGEID ## 1249-1253.)  Plaintiff also argues that the ALJ failed to "provide a detailed explanation of her conclusion that the Listings were not met or equaled."  (*Id.*)

Thus, Plaintiff argues that the ALJ erred in assessing whether Plaintiff meets listing 1.06. To satisfy this listing, Plaintiff must have an impairment as follows:

> 1.06  *Fracture of the femur, tibia, pelvis, or one or more of the tarsal bones*. With:
>
> A.      Solid union not evident on appropriate medically acceptable imaging and not clinically solid;
>
> **_and_**
>
> B.      Inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur or is not expected to occur within 12 months of onset.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.06 (emphasis added).  The regulations define a claimant's "[i]nability to ambulate effectively" as follows:

> Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the

individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 CFR § Pt. 404, Subpt. P, App. 1 § 1.00B(2)(b)(1). The regulations further provide:

To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 CFR § Pt. 404, Subpt. P, App. 1 § 1.00B(2)(b)(2).  Additionally, the evidence must show that Plaintiff's impairment "has lasted or can be expected to last for a continuous period of 12 months."  20 C.F.R. § 404.1525(c)(4).

Plaintiff has the burden of proving that she meets or equals all of the criteria of a listed impairment. *Malone v. Comm'r of Soc. Sec.*, 507 F. App'x 470, 472 (6th Cir. 2012) ("Plaintiff had the burden of showing that his impairments were equal or equivalent to a listed impairment."); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 391 (6th Cir. 1999) (clarifying that the burden of proving disability remains with the Social Security claimant at Steps 1 through 4 and does not shift to the ALJ until Step 5).  A decision that a claimant meets a listed impairment "must be based solely on medical evidence supported by acceptable clinical and diagnostic techniques."  *Land v. Sec'y of H.H.S.*, 814 F.2d 241, 245 (6th Cir. 1986).  In determining whether a claimant satisfies the requirements of a listing, the ALJ must "actually evaluate the evidence, compare it to Section [1.06] of the Listing, and give an explained conclusion, in order to

facilitate meaningful judicial review. Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence." *Reynolds v. Comm'r of Soc. Sec.,* 424 F. App'x 411, 415–16 (6th Cir. 2011) (citations omitted).

As to the "A" criteria of Listing 1.06, Plaintiff directs the Court to two diagnostic imaging records which Plaintiff argues "evidence that there is not a solid union in the femur": a March 21, 2018 x-ray of Plaintiff's femur, *see* R. at 1128, and an April 2018 CT scan of Plaintiff's femur, *see* R. at 1126. (ECF No. 13 at PAGEID # 1250.) The Commissioner does not appear to dispute that Plaintiff has met her burden to show that she meets Listing 1.06's "A" criteria. (*See* ECF No. 16.) As to her ability (or inability) to ambulate effectively under the "B" criteria of Listing 1.06, Plaintiff submits one conclusory sentence in support: "The record consistently documents [Plaintiff's] difficulty with ambulation due to pain, weakness; and history of severe injuries. *PageID No.* 130-131; 811; 827; 831; 857; 874; 878; 1194-1205." (ECF No. 13 at PAGEID # 1251.)[2] Plaintiff argues this evidence "supports the finding that her impairments limit her ability to ambulate effectively and . . . satisfy the requirements of Listing 1.06." (*Id.*)

Plaintiff's argument is not well taken. The Undersigned finds that even assuming, *arguendo*, that it agreed with Plaintiff's statement that the Record "consistently documents [Plaintiff's] *difficulty* with ambulation," the Court does not agree that the Record documents Plaintiff's "*[i]nability* to ambulate effectively" during the alleged closed period of disability, as required to meet Listing 1.06. While some of the record evidence cited by Plaintiff, summarized

---

[2] It appears that Plaintiff cites to the CM/ECF page numbers, rather than to the Record, as the Court requires. (See ECF No. 4.) The corresponding Record citations to Plaintiff's quoted statement are: R. at 68-69; 743; 759; 763; 789; 806; 810; 1126-1137. The Court will cite to the Record.

below, relates only to Plaintiff's "history of severe injuries" outside of her femur injury, the Court finds that the remaining evidence submitted by Plaintiff only confirms that Plaintiff's "difficulty with ambulation" lasted until January 8, 2017 at the latest, which was only approximately four-and-a-half (4.5) months after her motor vehicle accident on August 25, 2016:

- R. at 68-69: Plaintiff's testimony during her February 7, 2019 hearing that she still uses a wheelchair, and that during the alleged closed period of disability she "used crutches for probably a good six months, three months, six months, somewhere around there."

- R. at 743: Notes from an October 25, 2016 visit with Jaya Thakur, MD, in which Dr. Thakur noted that Plaintiff had been in a nursing home for more than two months after her motor vehicle accident, and suffered chronic pain from her multiple fractures.

- R. at 759: Notes from a November 3, 2016 visit with Jacque Brown, OT, in which Ms. Brown set forth a "Plan of Care" for Plaintiff's treatment, which do not mention Plaintiff's ability to ambulate.

- R. at 763: Notes from a November 2, 2016 visit with Jacque Brown, OT, in which Ms. Brown commented that Plaintiff was "currently using crutches for ambulation."

- R. at 789: Notes from a September 13, 2016 visit with Nicholas Anthony Luisi, PA-C, in which Mr. Luisi commented that Plaintiff "does have significant bone loss involving the left femur."

- R. at 806, 810, 1126-1137: Notes from various visits with Dr. Taylor. On November 8, 2016, Dr. Taylor commented that Plaintiff was "using crutches, and [her] balance appears to be poor." On January 8, 2017, March 19, 2017, June 7, 2017, and March 21, 2018, Dr. Taylor commented that Plaintiff "is ambulating unassisted, and balance appears to be without issue," and Dr. Taylor advised Plaintiff to continue mobilization "without restrictions." On April

24, 2018, Dr. Taylor commented that Plaintiff "is ambulating unassisted, and [her] balance appears to be poor," and Dr. Taylor advised Plaintiff to continue mobilization "without restrictions."

- R. at 1126-1137: Progress notes from visits with Dr. Taylor from November 8, 2016 to April 24, 2018, in which (except for during the November 8, 2016 visit) Dr. Taylor commented that Plaintiff "is ambulating unassisted," and that her balance either appeared to be "without issue" or "poor."

Thus, the record evidence supports Plaintiff's own testimony that her "difficulty with ambulation" lasted between three and six months. This is well short of the twelve month requirement under Social Security regulations, as Plaintiff's own counsel appeared to concede during Plaintiff's hearing, when counsel affirmatively stated that "it was a stretch" to argue that Plaintiff met the criteria of Listing 1.06:

ALJ:     Okay, okeydokey. Any other questions?

AATY:    Your Honor --

ALJ:     Counsel?

ATTY:     -- just to mention that I -- so in reviewing the record, I did see that as well and **I'm not sure if that could be considered equaling 1.06** because she has a non-union in her fracture. And a --

ALJ:     But she's working at SGA, so that's not going to --

ATTY:    But she had difficulty ambulating for 12 months. Again, **it was a stretch, but I thought I would just throw it on the record**.

ALJ:     **But she ambulated without crutches after six months, is what she said.**

ATTY:    **And I understand, Your Honor.**

ALJ:     Okay.

ATTY:    But no other questions, thank you.

(R. at 81.)[3]  Accordingly, the Court agrees with the Commissioner that Plaintiff "looks to her

functioning almost exclusively within the first three months immediately following her

accident," which is insufficient to establish her alleged disability.  (ECF No. 16 at PAGEID #

1258.)

Finally, the Court also finds that the ALJ properly evaluated the evidence, compared it to

Listing 1.06, and gave an explained conclusion in order to facilitate meaningful judicial review:

> The claimant does not meet Listing 1.06 because there is no evidence of solid union on appropriate medical imaging and not clinically solid with an inability to ambulate effectively, and return to effective ambulation or expected ambulation within 12 months of onset. The applicable regulations provide that, to ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. The regulations provide the following, non-exclusive examples of ineffective ambulation: the inability to walk without the use of a walker, two crutches or two canes; the inability to walk a block at a reasonable pace on rough or uneven surfaces; the inability to use standard public transportation; the inability to carry out routine ambulatory activities, such as shopping and banking; and the inability to climb a few steps at a reasonable pace with the use of a single hand rail (20 CPR Part 404, Subpart P, Appendix 1 § l.00B2b(2)). **Although the claimant ambulated briefly with a wheelchair and then crutches, January 2017, status post the surgeries to repair her multiple fractures, the claimant was ineffective ambulating without assistance and with no balance issues. Accordingly, the claimant returned to effective ambulation before 12 months of onset.**

(R. at 23-24 (emphasis added, citation omitted).)  With this detailed explanation, the ALJ

anticipated all of the evidence cited by Plaintiff, discussed that evidence, and properly concluded

that Plaintiff "returned to effective ambulation before 12 months of onset," disqualifying her

from meeting the requirements of Listing 1.06.  (*Id.*)  The ALJ's explanation was proper and

supported by substantial evidence.

---

[3] While the Court does not consider Plaintiff's argument regarding Listing 1.06 to be frivolous, the Court encourages counsel not to use litigation to "throw out" theories to see what sticks, especially in light of the current crisis facing the Social Security Administration and the judicial system due to the exponential increase in filings.

For these reasons, it is **RECOMMENDED** that Plaintiff's contentions of error be **OVERRULED**, and the Commissioner's decision be **AFFIRMED**.

## VII.  CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Based on the foregoing, it is therefore **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

## <u>PROCEDURE ON OBJECTIONS</u>

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816*,* 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to

specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: July 15, 2021                    /s/ *Elizabeth A. Preston Deavers*
                                       **ELIZABETH A. PRESTON DEAVERS**
                                       **UNITED STATES MAGISTRATE JUDGE**